UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GIAMPIERO LANDONI, ET AL | * | |
| | * | |
| PLAINTIFFS | * | |
| | * | |
| VS. | * | CASE NO:    1:07-CV-00462 |
| | * | |
| PIETRO BARBI | * | |
| | * | |
| DEFENDANT | * | |

**DEFENDANT'S MOTION TO DISMISS PURSUANT TO F. R. Civ. P. 19(b) FOR
FAILURE TO JOIN MUSAN SIKKA AS CO-DEFENDANT**

The Defendant, Pietro Barbi, by and through his attorney, Andrew Fontanella,

Esq., hereby files this Motion to Dismiss Pursuant to F. R. Civ. P. 19(b) for Failure to

Join Musan Sikka as Co-Defendant, and in support avers the following:

**STATEMENT OF FACTS**

The original Complaint for money damages was filed with the Court named one

Defendant, Pietro Barbi.  The gravamen of the Complaint surrounds a complex,

international financial venture that involved, among other persons, the Defendant Pietro

Barbi and his colleague, a financial business consultant residing in England by the name

of Musan Sikka.  The Defendant and Musan Sikka had known each other for about

fifteen (15) years and had done business in the past.

The Defendant had been exploring an investment opportunity which employed the

use of historic Paraguayan war bonds.  Mr. Barbi was acquainted with the brother of

Cesar Soler, an Argentine attorney.  Mr. Barbi knew that Cesar Soler's brother had

explored such an opportunity, and Mr. Barbi continued to pursue investment strategies

that employed such bonds.

Mr. Barbi never attempted this kind of investment before, but relied upon the

sophistication of one Musan Sikka to create an investment opportunity using these bonds.

The nature of the investment to be proposed to potential investors was as follows:  the

bonds would be sent to Hong Kong Shanghai Bank Corp (HSBC) in Singapore for

certification as to authenticity.  Once certified, HSBC would use the bonds to negotiate a

guaranty of $25 million dollars from Deutsche Bank, also in Singapore.  The guaranty

extended by Deutsche Bank would be invested in an investment house in Dubai, in the

hopes of a very profitable return.  This was the understanding of the Plaintiff Mauro

Landoni [all subsequent references are made to the Deposition of Plaintiff Mauro

Landoni taken on November 15, 2007]:

> *Page 88, Lines 5-14*
>
> [5]   Q:      *Okay.  The $365,000 was to get the*
> [6]   *bonds certified, right?  I think he understands.*
> [7]   A:      *Yes.*
> [8]   Q:      *And then the bank would issue a*
> [9]   *guarantee of $25 million based upon the value of*
> [10]  *the bonds, right?*
> [11]  A:      *Yes.*
> [12]  Q:      *And that $25 million would be invested*
> [13]  *by the investment house?*
> [14]  A:      *That's right.  Exactly.*

This proposition was presented to Andrea Bernardi, a colleague of Pietro Barbi, a

broker for potential investors to finance the deal.  Andrea Bernardi met and

communicated the deal to the Plaintiff Mauro Landoni at a meeting in 2003.

> *Page 38, Lines 15-19*
>
> [15]  Q:      *So, you have a meeting with*
> [16]  *Mr. Bernardi some time in October of 2003 and it*
> [17]  *is just you and Mr. Bernardi, no one else in the*
> [18]  *room?  Is that right?*
> [19]  A:      *Yes.*
>
> *      *      *

*Page 44, Lines 12-17*

[12]    Q:      Okay.  Did you have any questions for
[13]    Mr. Bernardi after he explained what the
[14]    investment was to you?
[15]    A:      We wanted to meet Mr. Barbi, or at
[16]    least to speak to him over the telephone, if we
[17]    couldn't meet him in person.


The Plaintiff Mauro Landoni received a copy of a pre-contractual agreement with

the names of persons who would share in the investment.

*Page 60, Line 20-22*

[20]    Did you find out in the first meeting
[21]    with Mr. Bernardi how many partners there were
[22]    in the Petros project?

*Page 61, Lines 1-22*

[1]     A:      No, in the meeting lasting half an hour
[2]     which we had Mr. Bernardi, this matter did
[3]     not come up.
[4]     Q:      In your first telephone converation
[5]     with Mr. Barbi, did he tell you how many people
[6]     were going to be partners in the Petros project?
[7]     A:      No, he sent us then in writing the-
[8]     what he-excuse me, he sent us then in writing
[9]     repetition of what he did not say by telephone.
[10]    Q:      You have in your hand what has been
[11]    marked Exhibit M. Landoni Number 6, I believe,
[12]    that's the precontractual agreement.
[13]    A:      Right.
[14]    Q:      When is the first time that you saw
[15]    that document?
[16]    A:      Always in that range of time.
[17]    Q:      In between Bernardi's meeting and your
[18]    initial investment?
[19]    A:      Right, yes.
[20]    Q:      Somewhere in there?
[21]    A:      Right.
[22]    Q:      How did you first receive this?  Was it

*Page 62, Line 1*

[1]     by email, by fax, how?

*Page 79, Lines 3-21*

[3]     Q:      Okay.  So, at the second meeting with
[4]     Bernardi, you find out that there are other
[5]     partners in this?  Is that right?
[6]     A:      Yes.

*[7]     Q:       Okay.  Did you ask-did you know who*
*[8]     Cesar Soler was at that second meeting with*
*[9]     Barbi?*
*[10]    A:       No, never heard about, again, Musan*
*[11]    Sikka, Cesar Soler.*
*[12]    Q:       So, after-*
*[13]    A:       But knew about these people only*
*[14]    telephone, by Mr. Barbi, because Mr. Barbi*
*[15]    explained to us that Musan Sikka is gentleman*
*[16]    very strategic gentleman in financial business,*
*[17]    worked with him at different time for big*
*[18]    project, and also Cesar Soler is the man in*
*[19]    charge of the owner of this bond.*
*[20]    Q:       Of the bonds?*
*[21]    A:       Of the bonds.*
*[22]    Q:       Okay.*

The Plaintiff Mauro Landoni became clear about the number of investors who

would share the profits:

*Page 86, Lines 3-15*

*[3]     Q:       Now, before that investment of*
*[4]     $365,000, I want to be sure what your*
*[5]     understanding of what that money was for.*
*[6]     There's no question, that was an intro.*
*[7]     Did you believe that there were other*
*[8]     people in the five partners who were investing*
*[9]     some expense money in this project?*
*[10]    A:       Are you talking about this Petros*
*[11]    project or other projects?*
*[12]    Q:       No, Petros.*
*[13]    A:       I imagine that in the Petros project,*
*[14]    all of the investors would be the five people*
*[15]    mentioned in the document.*

In fact, Mr. Sikka was very involved in the mechanics of the operation.  He

directed the amounts of money and the required recipient of all funds invested by the

Plaintiffs.  When the investment strategy was modified, the Plaintiff Mauro Landoni

knew well that Musan Sikka was orchestrating the investment very closely.

*Page 107, Lines 1-20*

*[1]     Q:       Did you personally speak, by phone, to*
*[2]     Mr. Barbi about more money after the $250,000?*
*[3]     A:       Yes, because he told me, Mauro, come*
*[4]     on, you have to do another investment, because*
*[5]     we need to this money for tax, for new*
*[6]     evaluation, for-*

4

*[7]    Q:    The $15,000?*
*[8]    A:    Right.  Mostly for travel expenses for*
*[9]    Mr. Musan.  That was the reason.*
*[10]    Q:    Did you ever meet Mr. Sikka before?*
*[11]    A:    No.*
*[12]    Q:    The $15,000?*
*[13]    A:    At that time, no.  We never meet. But*
*[14]    he confirm in his telephone call that Mr. Sikka*
*[15]    was doing a very good job, but he needed help,*
*[16]    more help, please pay this $15,000 to help me*
*[17]    and to travel-to travel around to receive a*
*[18]    evaluation of a guarantee.*
*[19]    Q:    Did you pay the $15,000?*
*[20]    A:    Of course.*

Not only was Musan Sikka an intricate part of this financial deal, but he received

the money directly in his personal account.

*Page 113, Lines 9-19*

*[9]    Q:    Do you know what was European*
*[10]    Investment Management?*
*[11]    A:    It was the company which was supposed*
*[12]    to make dual certifications.  It's cited here in*
*[13]    Exhibit 8, European Investment Management.  So,*
*[14]    I supposed Mr. Barbi knows what it's all about, i*
*[15]    don't.  And on the other hand, all the other*
*[16]    payments, were made-were made to Musan's*
*[17]     personal account, not just the $15,000, but also*
*[18]    the $50,000, the $47,500 and the $80,000.*
*[19]    Following Mr. Barbi's instructions.*

The Landonis even requested a meeting with Mr. Sikka, knowing that he was part

of this deal. The Landonis needed assurances that all was going well.

*Page 114, Lines 2-18*

*[2]    Now, so you said that in 2000-*
*[3]    somewhere in 2005, the middle of 2005, there was*
*[4]    a meeting between you, Barbi, Bernardi and your*
*[5]    father.  Is that right?*
*[6]    A:    And Musan?*
*[7]    Q:    So, five people?*
*[8]    A:    Middle of 2005 you mentioned.*
*[9]    Q:    Okay, in the middle of 2005.  In-*
*[10]    A:    June.*
*[11]    Q:    June.  Who was at that meeting?*
*[12]    A:    Me, my father, Barbi, Musan Sikka, and*
*[13]    Bernardi.*
*[14]    Q:    And Bernardi, okay.  Where did the*
*[15]    meeting take place?*
*[16]    A:    The meeting take place in a hotel*

5

[17]    *called the Villa Lita in Linate, just 30 minutes*
[18]    *from Milan.*

\*        \*        \*

*Page 115, Lines 1-6*

[1]    *Q:        Who called this meeting?*
[2]    *A:        The meeting was called by-both by*
[3]    *us, the Landonis.  We agreed to call this*
[4]    *meeting because we would like to know*
[5]    *personally, also, Mr. Musan Sikka.  We wanted to*
[6]    *get to know and meet Mr.Musan Sikka.*

Mauro Landoni kept in close contact with Musan Sikka after the meeting in 2005.

*Page 126, Lines 20-22*

[20]    *Q:        Okay, after that last payment of*
[21]    *$30,000, when is the next time that you hear*
[22]    *anything about Petros, good or bad?*

*Page 127, Lines 1-22*

[1]    *A:        Well, after this payment, I stayed in*
[2]    *contact with Musan, remember that I had already*
[3]    *met Musan, I had his phone number.*
[4]    *Q:        Oh, that's the phone number on the*
[5]    *bottom of Exhibit 1?*
[6]    *A:        Yes.  I would phone him in London, and*
[7]    *he-I told him to let me know as soon as the*
[8]    *operation concluded.  And that I would have*
[9]    *my-and-whereas my father, for his part,*
[10]    *was on the phone with Barbi and Barbi was*
[11]    *updating my father about the operation.*
[12]    *Q:        Okay.  Did there come a point in time*
[13]    *when you thought that this investment was not*
[14]    *going to work?*
[15]    *A:        No.  No, there was no time, we were*
[16]    *always trustful.  So much so that in October of*
[17]    *2005, I received a communication from Musan who*
[18]    *told me although I am not in contact with you,*
[19]    *you should know that-that the operation would*
[20]    *be carried out-would be concluded.*
[21]    *Q:        How did Mr. Sikka communicate with you,]*
[22]    *with a letter or email or phone?*

*Page 128, Lines 1-4*

[1    *A:        Well, we would talk on the telephone.]*
[2]    *But sometimes he would send messages when I*
[3]    *couldn't talk to him, so he would send*
[4]    *messages by telephone.*

\*        \*        \*

6

*Page 131, Lines 19-22*

[19]  Q:       Mr. Landoni, after the meeting in June
[20]  of 2005, where you say the investment strategy
[21]  changed, did you have any more conversations
[22]  with Mr. Barbi by phone or in person about why

*Page 132, Lines 1-21*

[1]   you weren't seeing any profits?
[2]   A:       No, I was saying that after that date,
[3]   most of the conversations were between my father
[4]   and Barbi.  It's possible that occasionally
[5]   my father, while talking to Barbi, handed the
[6]   handset to me to have-to talk with him.  My
[7]   conversations were with Musan.
[8]   Q:       What conversations did you have with
[9]   Musan about where your profits are?
[10]  A:       The conversations were of the following
[11]  sort:    Musan, please tell me when the operation
[12]  is going to take place and if you like I can go
[13]  to London and we can meet there.
[14]  Q:       Did he ever respond to you when this
[15]  investment would be completed and you would
[16]  start seeing your investment returns?
[17]  A:       He told us to be patient but that
[18]  the-the sending of the profits were imminent.
[19]  So much so that we advised our bank to expect
[20]  the arrival of a payment in this amount,
[21]  $2,387,500.

When it appeared that the deal did not work, Mauro Landoni blamed both Pietro

Barbi and Musan Sikka.

*Page 130, Lines 3-9*

[3]   Q:       Your investment in Petros didn't work,
[4]   right?
[5]   A:       Well, this is my idea now, today, to
[6]   read to you.  Well, according to these data, it
[7]   didn't work.  But how do we know that-that
[8]   Barbi and Musan didn't carry it off and then
[9]   split our money off to other resting place.

The facts of this case point to Musan Sikka as the principal engineer of the

investment, with Mr. Barbi simply being the person communicating the original strategy

and any of the mid-stream adjustments to the Plaintiffs as the principal investors.

**STATEMENT OF POINTS AND AUTHORITIES**

Rule 19(b) of the Federal Rules of Civil Procedures governs the Court's decision to dismiss an action if a person who is required to be joined, if feasible, cannot be joined.

While F. R. Civ. P. 12(b) states that the the defense of failure to join a party under Rule 19, must be raised by motion prior to pleading if a responsive pleading is allowed, F. R. Civ. P. 12(h)(2) also allows the defense to be raised in any pleading or at the time of trial. It appears that the rule allows the preservation of such defense throughout the case, especially, when, as in the instant case, a party may not be in the position to make the motion until the completion of discovery. This defense was appropriately raised as the Defendant's third affirmative defense filed with the Answer to the original Complaint.

F. R. Civ. P. 19(a) sets forth the criteria for when a party is a necessary one and must be joined. The rule states in relevant part that a person must be joined as a party if:

> *(A)    "in that person's absence, the court cannot accord complete relief among existing parties; or*
>
> *(B)    "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:*
>
> *   *   *
>
> *(i i)    leave an existing party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of the interest.*

The Defendant asserts that Musan Sikka is a required party under the criteria of F. R. Civ. P. 19(a). Mr. Sikka was the co-creator of this investment opportunity using historic bonds and the only person skilled in investing them. Mr. Barbi had some

8

financial investing experience but never consulted on transactions using historic bonds as collateral.  The Court would not be able to accord a complete relief among the present parties, since the issue of personal guaranty allegedly extended by Mr. Barbi to the Plaintiffs must be connected to the nature of the transaction as created by Musan Sikka, the true creator of the project and whether or not it was a guaranteed investment.

In the transcript of the deposition of the Co-Plaintiff Mauro Landoni, it is clear that Mauro Landoni made the ultimate decision about whether to invest in this project. He knew that there were multiple partners that would split the profits.  Mr. Sikka could provide invaluable information to this court about the true nature of this transaction; the financial health all the institutions involved in this transaction; whether or not, Mr. Barbi, did extend or had any authority to extend a guaranty; and whether any alleged guaranty should have been an obligation of one partner or all partners in this transaction.

It is also clear from the record that Musan Sikka had an interest that is the subject of this action.  If Musan Sikka is not made a part of this lawsuit, it would leave Mr. Barbi subject to a substantial risk of incurring more than his share of the alleged guaranty for the investment of this project.  Mr. Barbi should not bear all the risks of this failed investment.  All of the partners, particularly Musan Sikka as the creator of the project, should bear his part of the risk of the failure, not only the potential gain of any expected profits.

Once the Court makes an analysis under the criteria of F. R. Civ. P. 19(a) about whether Musan Sikka is a required party, the condition precedent for the Court to require joinder is whether or not Musan Sikka is subject to service of process.  Mr. Sikka is not subject to service of process.  He is a citizen of England and has never come to the

9

United States as part of this transaction.  Although based upon the criteria, he is a

necessary party, joinder is not feasible.  Therefore, the next analysis, pursuant to F. R.

Civ. P. 19(b) is what action the Court should take if joinder is not feasible.  The Court

must be concerned with the determination about whether, in equity and good conscience,

the action should proceed against these parties or should be dismissed.  The Court should

make the decision based upon the following criteria:

> (1)     *the extent to which a judgment rendered in the person's absence might prejudice*
>
>         *that person or the existing parties;*
>
> (2)     *the extent to which any prejudice could be lessened or avoided by:*
>
>         (A)     *protective provisions in the judgment;*
>
>         (B)     *shaping the relief; or*
>
>         (C)     *other measures.*
>
> (3)     *whether a judgment rendered in the person's absence would be adequate; and*
>
> *whether the Plaintiff would have an adequate remedy if the action were dismissed for a*
>
> *nonjoinder.* F. R. Civ. P. 19(b)

Using the criteria of F.R.Civ P. 19(b), Mr. Barbi is the only party to this case out

of all of the five potential investors in the financial venture.  He is now the only one

subject to a possible judgment from this Court to reimburse the Plaintiff's their

investments based upon an alleged personal guarantee.  If this promise were part of the

financial investment, then Mr. Barbi should stand trial with Musan Sikka as well, since

Mr. Sikka was the mastermind of the deal.

Due to the overwhelming prejudice to the Defendant in this case, it would be

unfair for the Court to permit this case to proceed in the absence of  Musan Sikka as a co-

defendant.


Respectfully Submitted,


/s/ Andrew Fontanella, Esq.
Andrew Fontanella, Esq.
Attorney for Defendant Pietro Barbi
611 Park Avenue, Suite 100
Baltimore, Maryland 21201
(410) 659-7500
Federal Bar No. 457144


REQUEST FOR HEARING


The Defendant Pietro Barbi hereby respectfully requests a hearing on his

Motion to Dismiss.


/s/ Andrew Fontanella, Esq.
Andrew Fontanella, Esq.


11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of April 2008, a true and correct copy

of Defendant Pietro Barbi's Motion to Dismiss Pursuant to F. R. Civ. P. 19(b) for Failure

to Join Musan Sikka as Co-Defendant was filed electronically and served first-class mail,

postage prepaid to:

Philip T. Evans
Elizabeth L. Phelps
Holland & Knight, LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006
Counsel for Plaintiffs Giampierio Landoni and Mauro Landoni

                                                        /s/ Andrew Fontanella
                                                        Andrew Fontanella

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

GIAMPIERO LANDONI, ET AL     *

         PLAINTIFFS     *

VS.     *       CASE NO:    1:07-CV-00462

PIETRO BARBI     *

         DEFENDANT     *

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PURSUANT TO F. R. CIV. P. 19 FOR FAILURE TO JOIN MUSAN SIKKA AS CO-DEFENDANT

UPON CONSIDERATION OF Defendant Pietro Barbi's Motion to Dismiss

Pursuant to F. R. Civ. P. 19(b) for Failure to Join Musan Sikka as Co-Defendant and any

opposition thereto, it is by the United States District Court for the District of Columbia, this

_____ day of _____ 2008, hereby

**ORDERED** that Plaintiffs' case be dismissed.

_____

JUDGE
U.S. District Court for the District of Columbia

Copies provided to:

Andrew Fontanella, Esq.
Philip T. Evans, Esq.
Elizabeth L. Phelps, Esq.

1