UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GIAMPIERO LANDONI and<br>MAURO LANDONI<br><br>Plaintiffs,<br><br>v.<br><br>PIETRO BARBI<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:07-cv-462

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs Giampiero Landoni and Mauro Landoni, by undersigned counsel, hereby file

this Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss

Pursuant to Fed. R. Civ. P. 19(b) for Failure to Join Musan Sikka as Co-Defendant.  In support of

this Opposition, Plaintiffs state the following:

## I.    BACKGROUND

Plaintiffs Giampiero Landoni and Mauro Landoni (the "Landonis") filed their Amended

Complaint in this case on August 14, 2007 ("Amended Complaint"), alleging four causes of

action against Defendant Pietro Barbi ("Mr. Barbi").  The causes of action, which include breach

of contract, promissory estoppel, negligent misrepresentation, and fraudulent conveyance, all

stem from a guarantee agreement made by Mr. Barbi to the Landonis (the "Guarantee").  The

Guarantee consisted of a personal guarantee made by Mr. Barbi to the Landonis to reimburse the

Landonis for monies they invested in a financial venture, which was organized and initiated by

Mr. Barbi, if the financial venture proved unsuccessful.  The financial venture – which, as

described below, proved to be more of a scheme than a venture – never materialized, and the

Landonis' investment of almost $800,000 is gone. Nonetheless, and despite his promises and the Guarantee, Mr. Barbi has failed to reimburse the Landonis for any of their investment.

## A.    The Financial Venture Scheme

In the fall of 2003 the Landonis were introduced to Mr. Barbi, the promoter of the financial venture in which the Landonis ultimately invested almost $800,000.00. Mr. Barbi proposed an investment plan which centered on historical Paraguayan bonds owned by a Mr. Cesar Soler, and the use of those bonds as the starting point for a complex transaction which would go through three different international financial institutions. The bonds were to be evaluated and certified by the first bank, and then the bonds would be used as a collateral to obtain a guarantee from the second bank. The bank guarantee was then supposed to be invested with an investment company, the third financial institution, which would make investments designed to generate substantial returns for the investors.

To accomplish this scheme, Mr. Barbi called on the Landonis to fund the initial capital requirements. Mr. Barbi was introduced to the Landonis by Andrea Bernardi, a common business partner to both Mr. Barbi and the Landonis. Upon assurances by Mr. Barbi that he would personally guarantee the Landonis' investment, in November 2003, the Landonis dispersed $365,000 per Mr. Barbi's instructions to cover the "fee" allegedly paid to the first bank for that bank's services in certifying the bonds.[1]

Following this initial "investment", to keep the scheme afloat, the Landonis made additional significant payments only after Mr. Barbi's assurances that he would personally guarantee their investment. Specifically, the Landonis disbursed $250,000 in February 2004,

---

[1] In the discovery which has taken place in this matter, Mr. Barbi has been unable to produce any tangible evidence which demonstrates that any of the alleged financial transactions took place or, more to the point, what happened to the money invested by the Landonis. All Mr. Barbi can do is point to Musan Sikka as the individual who knows what happened to the Landonis' money. (Ex. 3, Barbi Dep. 158:20-159:9; see also 88-89, 101-102, 105:20-107:3, 125:19-126:8.)

$15,000 in May 2004, $80,000 in September 2004, $47,500 in December 2004, and $30,000 in July 2005. In total, the Landonis invested $787,500 in the financial venture. Nonetheless, Mr. Barbi has not followed through on the Guarantee and has not reimbursed any money to the Landonis.

**B.    Counts I and II of Plaintiffs' Amended Complaint Are Limited to the Guarantee Agreement Between Plaintiffs and Defendant.**

The Amended Complaint is based on Mr. Barbi's failure to reimburse the Landonis, despite his oral and written promises to do so. The first two counts for breach of contract and promissory estoppel are based on the Guarantee provided by Mr. Barbi to Landoni, which is attached as Exhibit 1.[2] As evident from Exhibit 1, no other parties were involved in the Guarantee, and thus, counts one and two are limited to the relationship between the Landonis and Mr. Barbi. Specifically, Count I alleges that in the Guarantee, Mr. Barbi agreed to reimburse Plaintiffs for all funds invested in the financial venture should the investment fail to achieve a positive return. Based upon this representation, the Landonis' accepted Mr. Barbi's offer of a Guarantee and advanced $787,500.00 towards the financial venture. Accordingly, while the Landonis performed their obligations, Mr. Barbi, in failing to reimburse the Landonis, breached the Guarantee.

Similarly, Count II alleges that Mr. Barbi promised the Landonis that he would reimburse them for all funds invested in the financial venture should the investment fail to achieve a positive return. In so promising, Mr. Barbi induced the Landonis into advancing funds for the financial venture, and they relied upon his promise. The fact that this promise along with the Guarantee was only between the Landonis and Mr. Barbi, despite the involvement of other

---

[2] Exhibit 1 to this Opposition was attached to the Amended Complaint as Exhibit B.

parties in the scheme, is supported by deposition testimony taken during discovery in this case.[3] Mr. Barbi alone continually assured the Landonis, first verbally, and later in writing that he would personally guarantee their investment in the financial venture. Mr. Barbi made these assurances prior to each of the Landonis' disbursement of funds, and the Landonis would not have made the investments if not for Mr. Barbi's personal guarantee. (Ex. 2, Landoni Dep. Tr. 99:14-20.)

For instance, in October 2003, before the Landonis' first disbursement and during their first telephone conversation with Mr. Barbi, Mr. Barbi personally guaranteed the Landonis' investment. (Ex. 2, Landoni Dep. Tr. 60:6-12; 80:4-14.) In February 2004, Mr. Barbi continued to offer his personal guarantee in return for continued monetary investments from the Landonis. (Ex. 2, Landoni Dep. Tr. 98:14-99:2; 102:9-22.) Yet again, in May 2004, the Landonis relied on Defendant's personal guarantee before making further investments. Mr. Mauro Landoni explained the Landonis' reliance on Mr. Barbi's guarantee in his deposition as follows:

> Q. And did Mr. Barbi say anything about guaranteeing this money, the return on this money, before you made the $15,000 investment?
>
> A. He constantly assured us in his telephone calls that if the deal failed, he would personally stand surety – that is he would guarantee our money. So much – so much so that we – we made additional payments, not only the $15,000, but also $80,000 in September [2004] and $47,500 in December [2004].

(Ex. 2, Landoni Dep. Tr. 108:8-17.)

Then, in the summer of 2005, the financial venture changed in scope. The alleged return on the investment was reduced because the parties were unable to obtain the bank guarantee as expected. Nevertheless, the Landonis were requested to make another investment. In July

---

[3] Although Defendant styled this Motion as a Motion to Dismiss, Defendant supported its Motion with deposition testimony and information beyond the four corners of the Amended Complaint and the accompanying attachments. Given that Rule 12(h)(2) allows Defendants to raise a Rule 19(b) after discovery has commenced and even at trial, Plaintiffs in opposing this Motion will also refer to information obtained in the discovery process that was not included in the Amended Complaint.

2005, the Landonis' disbursed $30,000, and again, Mr. Barbi personally guaranteed this disbursement. (Ex. 2, Landoni Dep. Tr. 126:2-6.)

Later, Mr. Barbi provided a written guarantee for Defendants. This written guarantee stated in relevant part, "With this letter I hereby confirm that whether the operation should not turn out fine for whatever reason, I will personally be the only responsible [sic] for all the money you invested in the same operation." (*See* Ex. 1.)

No person other than Mr. Barbi ever personally guaranteed the Landonis' investment, including Musan Sikka, the party seemingly most involved in the logistics of the transaction. (*See, e.g.*, Ex. 2, Landoni Dep. Tr. 78:17-79:2.) In fact, it was understood by the Landonis that this was Mr. Barbi's function in the proposed investment. He was the guarantor of the investment or the surety. (Ex. 2, Landoni Dep. Tr. 148:12-21.) Even Mr. Barbi admits that Mr. Sikka never saw the letter confirming Plaintiff's personal guarantee. (Ex. 3, Barbi Dep. Tr. 157:4-13 (referring to the letter which is attached hereto as Ex. 1).) In Mr. Barbi's deposition, Mr. Barbi further verified that he was the only one who guaranteed the Landonis' investment:

> Q. Okay. Do you recall if there were any phone conversations between you and Giampiero around this time about this – about why he chose to send this fax or why he was sending this fax?[4]
>
> A. Just to remind me that I – I made a commitment in repaying it.

(Ex. 3, Barbi Dep. Tr. 163:19-164:2.)

Mr. Barbi clearly states that he made the commitment. If Mr. Barbi truly believed that Mr. Sikka was responsible for the guarantee, then he could have said so. Or if he believed both he and Mr. Sikka were responsible, he could have said "we." Yet, Mr. Barbi plainly said that only he made the commitment to repaying the Landonis.

---

[4] The fax referred to in this question is attached as Exhibit 4. The fax cover page states, "[n]ote the attachment," and the attachment is the written Guarantee.

**C.    Count III of Plaintiffs' Amended Complaint Is Limited to the Negligent Misrepresentation by Defendant to Plaintiffs.**

Count III, negligent misrepresentation, of Plaintiffs' Amended Complaint is similarly based only on Mr. Barbi's communications with the Landonis. The negligent misrepresentation alleged relates only to Mr. Barbi's statements that he would reimburse the Landonis for their investments and the fact that he failed to make such reimbursement. However, even if this claim is to be considered in terms of the scheme as a whole, it is unquestionable that Mr. Barbi was involved in the transaction from the beginning, and was the contact person between all of the parties in the transaction, including ultimately the Landonis. (Ex. 3, Barbi Dep. Tr. 159:11-15; 86:20-87:2.) Mr. Barbi admits that he was the one who knew of the historical bonds from the Soler family, and then discussed with both Mr. Sikka and Mr. Bernardi the possibility of a financial venture using those bonds. (Ex. 3, Barbi Dep. Tr. 33:3-10.) Neither Mr. Bernardi nor Mr. Sikka were involved in the transaction before it was introduced by Mr. Barbi. (Ex. 3, Barbi Dep. Tr. 33:3-10; 33:22-34:5.)

For all payments, with the exception of one, Mr. Barbi was the one who communicated to the Landonis the need for the payment, either directly or through Mr. Bernardi. Mr. Barbi does not dispute that he spoke with one or both of the Landonis before each of those payments. (Ex. 3, Barbi Dep. Tr. 93:17-94:6.) And Mr. Barbi was fully aware of the Landonis' sixth and final payment, which was initiated or requested by Mr. Sikka. (Ex. 3, Barbi Dep. Tr. 151:12-152:2.) In sum, Mr. Barbi's role was integral to the financial venture as a whole as well as the negligent misrepresentations that the Landonis relied upon in making payments toward the investment.

**D.    Count IV of Plaintiffs' Amended Complaint Is Limited to Acts Committed by Defendant.**

Count IV of Plaintiff's Amended Complaint for fraudulent conveyance is obviously limited to acts committed by Mr. Barbi. The count alleges that Mr. Barbi fraudulently transferred the title to his home shortly after his confirmatory promise that he would reimburse the amount due to the Landonis. As his home is owned in part by Mr. Barbi and his wife and in part by Mr. Barbi's in-laws, this claim does not involve nor relate to any other parties involved in the financial venture scheme.

**II.    ARGUMENT**

Defendant seeks to dismiss the Amended Complaint pursuant to Rule 19 of the Federal Rules of Civil Procedure for failure to join an indispensable party, mainly Mr. Sikka. Rule 19 sets out a three-part analysis for determining whether a case should proceed in the absence of certain persons or entities: "First, the Court must determine if the absent party is 'necessary to the litigation,' second, if so, whether the party can be joined; and third, if joinder is infeasible, whether the action can nevertheless proceed 'in equity and good conscience.'" *FDIC v. Bank of New York*, 479 F. Supp. 2d 1, 9 (D.D.C. 2007).

In this case, Defendant fails to meet the first prong of the analysis. Mr. Sikka is not necessary to this litigation. Further, even if the Court were to find that Mr. Sikka is a necessary party, Defendant fails to show how Mr. Sikka is indispensable such that the litigation cannot proceed "in equity and good conscience." Accordingly, Defendant's Motion should be denied.

**A.    Mr. Sikka is Not a Necessary Party Under Rule 19(a).**

Rule 19(a) states that a person must be joined as a required party if (1) complete relief cannot be accorded in that person's absence, (2) the absent person claims an interest relating to the subject of the of the action and disposing of the action in the person's absence may impair the

7

person's ability to protect that interest, or (3) the absent person claims an interest relating to the subject of the of the action the person's absence in the action may "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *See also Coalition on Sensible Transportation v. Dole*, 631 F. Supp. 1382, 1385-1386 (D.D.C. 1986).

Defendant's Motion argues that the Court would not be able to accord complete relief among the present parties (the first factor above), yet seemingly asserts as a basis for this argument that Mr. Barbi, the sole defendant, would be subject to substantial risk of incurring more than his share of the alleged guarantee (the third factor above). Defendant does not make an argument under the second factor.

As to the first factor—Rule 19(a)(1)(A), it is clear that complete relief can be accorded in Mr. Sikka's absence. "A Rule 19(a)(1) inquiry is limited to whether the district court can grant complete relief to the persons already parties to the action," and "the effect a decision may have on the absent party is not material." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993). In this case, the Landonis seek a return of the money they invested in the financial venture scheme. They seek this reimbursement only from Mr. Barbi as Mr. Barbi is the party that personally guaranteed their investment and promised to repay them if the financial venture was unsuccessful. *See Primax v. Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43, 51 (D.D.C. 2003) (holding that "if plaintiff is the sole possessor of the rights being asserted against defendants, it is difficult to see how a court would be unable to accord relief in the absence of the additional party"). Accordingly, if the Court finds for the Landonis and orders Mr. Barbi to pay back the Landonis' investment, then complete relief can be granted.

Defendant argues that complete relief cannot be granted because the personal guarantee "must be connected to the nature of the transaction as created by Musan Sikka, the true creator of

the project and whether or not it was a guaranteed investment." (Pl. Motion at 9.) Defendant's argument fails. Even though Mr. Sikka was involved in and may have information related to the financial venture, that does not make him a necessary party under Rule 19(a). Mr. Sikka and Mr. Barbi are at best joint and several tortfeasors or co-obligors with regard to the financial venture and Guarantee, and "[a]n almost unbroken line of federal decisions holds that persons whose liability is joint and several may be sued separately in federal court." *Park v. Didden*, 695 F.2d 626, 631 (D.C. Cir. 1982).

Although the evidence supports the fact that the guarantee agreement was solely between Mr. Barbi and the Landonis, even if Mr. Barbi and Mr. Sikka are considered co-obligors as to the breach of contract and promissory estoppel claims, the law is clear that "co-obligors on a contract are jointly and severally liable for its performance." *Janney*, 11 F.3d at 405. The *Janney* Court further explains: "Today, the joinder of obligors is left to plaintiff's discretion by many courts and he may select defendants without being concerned about dismissal because of nonjoinder." *Id.* at 408.

Similarly, if Mr. Barbi and Mr. Sikka are considered joint tortfeasors, in a genuine joint tortfeasor case, the plaintiff is not required to join another alleged tortfeasor. *See Salton, Inc. v. Philips Domestic Appliances & Personal Care B.V.*, 391 F.3d 871, 878 (7th Cir, 2004); *see also Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."). Thus, Mr. Sikka's involvement in the events underlying the Landonis' claims, and ability to be source of evidence in the case, does not require joinder. *See id.* at 880 (recognizing that "when a plaintiff is harmed by the acts of several persons, all may be essential sources of evidence in a suit against

any," however, "if this possibility automatically required that all be joined, the rule that joint torfeasors are not be virtue of their jointness indispensable parties . . . would be overthrown").

Accordingly, the idea that Mr. Sikka may also be responsible for reimbursement to the Landonis, despite the evidence to the contrary, does not support Defendant's argument that complete relief cannot be granted in this case. Nor does it support Defendant's argument that if Mr. Sikka is not joined, Defendants will be subject to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations" under Rule 19(a)(1)(B)(ii). Defendant argues that if Mr. Sikka is not joined, "it would leave Mr. Barbi subject to a substantial risk of incurring more than his share of the alleged guaranty for the investment of this project." (Pl. Motion at 9.). However, "the possibility that [a defendant] may bear the whole loss if it is found liable is not the equivalent of double liability." *Janney*, 11 F.3d at 412. Instead, it is "a common result of joint and several liability and should not be equated with prejudice." *Id.* If Mr. Barbi is concerned that he may become liable for more than his share of the reimbursement to the Landonis, then Mr. Barbi may pursue an action for indemnification or contribution from Mr. Sikka. His right to do so is not affected by this case of the failure to join Mr. Sikka as a defendant.

Because Mr. Sikka is not a required party, the Court need not continue the Rule 19 analysis at this point. No inquiry under Rule 19(b) is necessary where the threshold requirements of 19(a) have not been satisfied. *Temple*, 498 U.S. at 8. However, even if the Court is to find that Mr. Sikka is a necessary party under Rule 19(a), Defendant cannot establish that Mr. Sikka is indispensable such that the case should be dismissed under Rule 19(b).

**B.    This Action Should Proceed "In Equity and Good Conscience."**

Assuming, without conceding, that Mr. Sikka is not subject to service of process in this jurisdiction and joinder is thus infeasible, the next Rule 19 inquiry for the Court is whether the

action can nevertheless proceed "in equity and good conscience" or should be dismissed. *Dole*, 631 F. Supp. at 1385. Under Rule 19(b), the Court must consider four factors in making this determination: (1) the extent that judgment rendered in the person's absence might be prejudicial to the person and existing parties, (2) the extent to which the Court can shape relief to lessen prejudice to the absentee or existing parties, (3) whether judgment rendered in the person's absence will be adequate, and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Taking these factors in reverse order, it is plain that this action should proceed as opposed to being dismissed. First, Plaintiff the Landonis will have no adequate remedy if the action is dismissed for nonjoinder. The Landonis' sole remedy here is against Mr. Barbi. Mr. Barbi is the person who continually assured the Landonis that he would personally guarantee their investment and drafted the written Guarantee. Mr. Barbi is subject to jurisdiction in the District of Columbia, and the Plaintiffs have chosen this District as the forum in which to pursue their remedy. The only other forum that may possibly be appropriate for this claim is Italy, but there is no certainty that an Italian court would have jurisdiction over this dispute or Mr. Barbi. And forcing the Landonis to move from their chosen forum and endure additional delay and costs, especially in a case where the evidence demonstrates that Mr. Sikka is not responsible for the Landonis' claims, weighs heavily against dismissal. *See Dole*, 631 F. Supp. at 1386.

Second, any judgment rendered in the absence of Mr. Sikka will be adequate. As this Court has held, a "judgment rendered will be adequate where plaintiff seeks to recover money from defendant pursuant to an asserted right of reimbursement established by a legal contract and the plaintiff is the sole possessor of the right." *Primax*, 260 F. Supp. 2d at 52. In this case, the contract is the Guarantee and the Landonis are the sole possessors of the right to seek

reimbursement pursuant to the Guarantee. Thus, any judgment ordered by the Court will be adequate.

The third factor—the extent to which the Court can shape the parties' relief to lessen prejudice—is really irrelevant to the analysis in this case. There is no prejudice to Mr. Sikka in not being joined in this case, and as explained below, the alleged prejudice to Mr. Barbi in being the sole defendant is a red herring in light of the case law on joint and several liability. Nevertheless, the Court has the power to fashion relief as it so chooses by, for example, precluding any further claims of reimbursement to the Landonis by Mr. Sikka or any one else. *See Primax*, 260 F. Supp. at 51.

Finally, consideration of the extent that judgment rendered in Mr. Sikka's absence might be prejudicial to Mr. Sikka or those already parties weighs in favor of allowing this action to proceed. Although Defendant does not identify its argument with a particular factor from Rule 19(b), it seems that Defendant is arguing that Mr. Barbi will be prejudiced if he is the only one out of the five potential investors, including Mr. Sikka, in the financial venture scheme to be held liable for reimbursing the Landonis. First, as described in detail above, Mr. Barbi's joint and several liability is not considered a prejudice. *Janney*, 11 F.3d at 412. Second, it is highly unlikely that Mr. Barbi would be subject to multiple lawsuits based on the Landonis' claims, which relate solely to the reimbursement promised to the Landonis. Even if there was some other way that Mr. Barbi could be subject to suit due to Mr. Sikka's absence, a defendant will not suffer prejudice in the form of vulnerability to further lawsuit when that harm is purely speculative. *See Primax*, 260 F. Supp. 2d at 51. Third, Mr. Barbi is not prejudiced because he can always pursue indemnification or contribution from Mr. Sikka, and a claim of prejudice

based on the "burden of filing a separate claim" has been deemed "minimal and insufficient to justify dismissal" of an action. *Id.*

In sum, Mr. Sikka is not a required party as Defendant claims, and even if he were, a review of the four Rule 19(b) factors demonstrates that "in equity and good conscience," this case should not be dismissed.

## III.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that Defendants' Motion to Dismiss be DENIED.

Respectfully submitted,

HOLLAND & KNIGHT LLP

By:    /s/ Elizabeth L Phelps
Philip T. Evans (D.C. Bar No. 441735)
Elizabeth L. Phelps (D.C. Bar No. 502026)
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C.  20006
Tel: (202) 955-3000/Fax: (202) 955-5564
philip.evans@hklaw.com
libby.phelps@hklaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 12th of May 2008, he caused a copy of the foregoing to be served by means of the ECF system on:

Andrew Fontanella, Esq.
LAW OFFICE OF ANDREW FONTANELLA
611 Park Avenue
Suite 100
Baltimore, MD 21201

/s/ Elizabeth L. Phelps_____
Elizabeth L. Phelps

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GIAMPIERO LANDONI and<br>MAURO LANDONI | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-462 |
| | ) | |
| PIETRO BARBI | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

UPON CONSIDERATION OF Defendant's Motion to Dismiss Pursuant to Fed. R. Civ.

P. 19(b) for Failure to Join Musan Sikka as Co-Defendant, and any opposition thereto, it is by

the United States District Court for the District of Columbia, this ____ day of _____ 2008,

hereby

**ORDERED** that Defendant's Motion to Dismiss is **DENIED.**

_____
**JUDGE JOHN D. BATES**

Copies provided to:

Philip T. Evans, Esq.
Andrew Fontanella, Esq.

# 5325370_v2

# Exhibit 1

Egr. Sig.ri
Giampiero Landoni
Mauro Landoni
Corso Europa 197
Rho(Milano)
Italia

Stimatissimi Sig.ri Landoni,

Prima di ogni altra cosa voglio esprimervi la mia più profonda gratitudine per la fiducia e stima che mi avete concesso dal primo momento che ci siamo conosciuti, questo grazie al nostro comune amico Andrea Bernardi di cui ho immenso rispetto come lo ho di voi.

Come espresso nella nostra conversazione telefonica del 14 settembre 2005 insisto nel avere sempre piena fiducia nella nostra operazione e la capacità di Musan di portarla a termine.

Premesso questo, per mezzo di questa lettera voglio confermarvi che nel caso che la operazione non dovesse andare a buon fine per qualsiasi ragione, io mi assumo personalmente la responsabilità della restituzione del capitale apportato da voi in detta operazione, non piu tardi del 30 novembre 2005, esautorando da ogni responsabilità ogni altra persona. Sono arrivato a questa decisione per rincuorarvi e affinchè non pensiate che la operazione sia stata intentata come un mezzo subdolo per appropriarsi di fondi altrui.

Vi ringrazio per la continua fiducia e pazienza.

In fede,

Pietro Barbi

Washington 28 Settembre 2005

09/28/05  02:29pm  P. 001

Dear Sirs
Giampiero Landoni
Mauro Landoni
Corso Europa 197
Rho (Milano)
Italy

Dear Giampiero and Mauro Landoni,

First of all I would like to thank you for the trust given to me since the first time we met, this was possible thanks to our common friend Mr. Andrea Bernardi of whom I have a lot of respect as well as I have respect for yourself.

As per our conference call of September 14, 2005 I keep trusting our operation and the ability of Mr. Musan to bring it to a fine conclusion.

With this letter I hereby confirm that, whether the operation should not turn out fine for whatever reason, I will personally be the only responsible for all the money you invested in same operation, and I am going to return all the money invested within November 30, 2005. I took this decision so that you do not think that the whole operation has started as a mean to steal third parties' money.

Thank you for your on-going trust and patience.

Signed,


Pietro Barbi

Washington September 28, 2005

# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4   GIAMPIERO LANDONI and        )

 5   MAURO LANDONI,               )

 6                Plaintiffs,  ) Case No.

 7        vs.                   ) 1:07-cv-462

 8   PIETRO BARBI,                )

 9                Defendant.   ) Volume 1

10

11

12           -      -      -      -      -

13        The deposition of MAURO LANDONI was

14   taken on Thursday, November 15, 2007, commencing

15   at 11:09 a.m., at the offices of Holland &

16   Knight, 2099 Pennsylvania Avenue, N.W.,

17   Washington, D.C., before Sally Jo Bowling,

18   Notary Public.

19           -      -      -      -      -

20

21

22
```

2

```
 1              A P P E A R A N C E S

 2

 3  ON BEHALF OF THE PLAINTIFF:

 4          PHILIP T. EVANS, ESQ.

 5          ELIZABETH L. PHELPS, ESQ.

 6          Holland & Knight

 7          2099 Pennsylvania Avenue, N.W.

 8          Washington, D.C.  20006

 9          (202) 457-7043

10          philip.evans@hklaw.com

11

12

13  ON BEHALF OF THE DEFENDANT:

14          ANDREW FONTANELLA, ESQ.

15          Law Office of Andrew Fontanella

16          611 Park Avenue, Suite 100

17          Baltimore, Maryland  21201

18          (410) 659-7504

19

20  ALSO PRESENT:

21          Mia Marbury, Legal Video Specialist

22          Carl Stoll, Interpreter
```

1                P R O C E E D I N G S

2                  —     —     —     —     —

3            VIDEO TECHNICIAN:  Here begins tape 1,

4 volume 1, of the video deposition of Mauro

5 Landoni, taken by counsel for the defendant in

6 the matter of Giampiero Landoni and Mauro

7 Landoni versus Pietro Barbi in the U.S. District

8 Court for the District of Columbia, case number

9 1:07-CV-462, held here in the offices of Holland

10 & Knight at 2099 Pennsylvania Avenue, Northwest,

11 Washington, D.C.

12           Today's date is November 15th, 2007.

13 The time indicated on the video screen is 11:09

14 a.m.  My name is Mia Marbury and I am a legal

15 video specialist.  The court reporter for today

16 is Sally Bowling.  Also the interpreter for

17 today is Carl Stoll.  We are employed by For The

18 Record.

19           Counsel, please introduce yourselves

20 and state whom you represent.

21           MR. FONTANELLA:  My name is Andrew

22 Fontanella and I represent the defendant, Pietro

1 Barbi.

2        MR. EVANS:  My name is Philip Evans,

3 I'm here with Libby Phelps, we represent

4 Giampiero Landoni and Mauro Landoni.

5        THE WITNESS:  My name is Mauro Landoni.

6        INTERPRETER:  My name is Carl Stoll,

7 I'm the interpreter.

8        JUDGE:  Would the court reporter please

9 swear in the interpreter, followed by the

10 witness.

11 Whereupon--

12                  CARL STOLL

13 an interpreter, was duly sworn to accurately

14 interpret the following proceedings:

15 Whereupon--

16                  MAURO LANDONI

17 a witness, called for examination, having been

18 first duly sworn, was examined and testified as

19 follows:

20                  EXAMINATION

21        BY MR. FONTANELLA:

22    Q.   Mr. Landoni, my name is Andrew

1 that he's a very reliable and a serious person,

2 and that this was a very special and very

3 lucrative -- and a very lucrative deal, but he

4 didn't actually go into details about the

5 transaction.

6    Q.   Okay, your first phone call with Mr.

7 Barbi, did Mr. Barbi say anything to you about

8 personally guaranteeing your investment in

9 Petros project?

10    A.   Yes, already in the first conversation,

11 he let us know that if the venture failed, any

12 losses would be covered by him.

13    Q.   And this -- this theme was repeated,

14 you know, in 100 subsequent telephone -- there

15 was the leitmotif.

16         Do you know how to spell that?

17    A.    L E I T.  Leitmotif.

18    Q.   Do you have a liberal arts major asking

19 the questions?

20         Did you find out in the first meeting

21 with Mr. Bernardi how many partners there were

22 in the Petros project?

1    A.    Probably.

2    Q.    Okay.  You're not sure?

3    A.    I'm not sure because we did the payment

4 beginning of November or probably we met to ask

5 -- to say and to explain again the good quality

6 of -- Bernardi at all the meetings was always

7 stressed how trustworthy Barbi was.

8    Q.    Okay.  In the second meeting with

9 Mr. Bernardi, the two documents that he showed

10 you, did they say anything -- did the documents

11 say anything about a personal guarantee by Mr.

12 Barbi?

13    A.    No.  About a personal guarantee, no.

14 But just Italian words.

15          But just Italian words which confirm

16 the trust.

17    Q.    Okay.  Did Mr. Bernardi tell you in

18 that second meeting that the personal guarantee

19 was part of this investment -- personal

20 guarantee of Mr. Barbi was part of this

21 investment?

22    A.    No.  No, Bernardi never said that, but

1 since the beginning, Mr. Barbi had confirmed

2 that over the telephone.

3    Q.   Okay.  So, at the second meeting with

4 Bernardi, you find out that there are other

5 partners in this?  Is that right?

6    A.   Yes.

7    Q.   Okay.  Did you ask -- did you know who

8 Cesar Soler was at that second meeting with

9 Barbi?

10    A.   No, never heard about, again, Musan

11 Sikka, Cesar Soler.

12    Q.   So, after --

13    A.   But knew about these people only by

14 telephone, by Mr. Barbi, because Mr. Barbi

15 explained to us that Musan Sikka is gentleman,

16 very strategic gentleman in financial business,

17 worked with him at different time for big

18 project, and also Cesar Soler is the man in

19 charge of the owner of this bond.

20    Q.   Of the bonds?

21    A.   Of the bonds.

22    Q.   Okay.

     1    A.    In charge of?  In charge of the owner?

     2          Mr. Soler was the owner of those bonds.

     3          Was the owner.

     4    Q.    Okay.  So, in your phone

     5  conversation -- all of your phone conversations

     6  with Mr. Barbi, before you paid the $365,000,

     7  basically Mr. Barbi was telling you how good he

     8  was and how good Mr. Musan Sikka was, how smart?

     9          MR. EVANS:  Objection.

    10          THE WITNESS:  Yes, not only that, but

    11  that the details of the operation would be

    12  explained by Bernardi by means of the documents.

    13  Plus the oral assurance, don't worry, because

    14  then the investment will be covered by me.

    15          BY MR. FONTANELLA:

    16    Q.    Did you think that the $365,000 that

    17  was invested in November of 2003 was the only

    18  investment that you were making in the Petros

    19  project when you made it?

    20    A.    Certainly I did.  Because as is stated

    21  here, it was intended to pay for the evaluation

    22  and certification of these historic bonds.

1 February, but very shortly before, because it

2 was presented to us as something extremely

3 urgent.

4    Q.    Okay.

5    A.    So, it could only have happened a short

6 time before.  In that space of time between the

7 15th and the 19th of February.

8    Q.    Okay.  Did Mr. Bernardi say anything to

9 you about whether that $250,000, if you were to

10 pay it, would be reimbursed to you as an expense

11 before profits were divided?

12    A.    Bernardi -- about Bernardi, I don't

13 remember, I don't think so.

14    Q.    Did Mr. Barbi tell you, by phone, that

15 this $250,000 would go back to you first before

16 the -- any investment profits were divided?

17    A.    No, Barbi didn't say that.  What he

18 said was that he offered us a guarantee for the

19 $250,000.  Because it's one thing to say, well,

20 the money will arrive, and I'm going to give you

21 $250,000, but it's something completely

22 different to say, look, friend, if the money,

99

1 per chance, should not arrive, I offer you a

2 guarantee.

3     Q.   Let me ask you a question, Mr. Landoni:

4 The first $365,000 that you paid, would you have

5 paid it if there was no personal guarantee by

6 Mr. Barbi?

7          MR. EVANS:  Objection.

8          THE WITNESS:  Well, because -- we paid

9 that money because we had a verbal assurance, a

10 handshake, so to speak, over the telephone, and

11 we were assured that at an early opportunity

12 this would all be recorded in writing.

13          BY MR. FONTANELLA:

14     Q.   So, my question to you, Mr. Landoni, is

15 if there was no personal guarantee, you would

16 never have invested that money?

17          MR. EVANS:  Objection.

18          THE WITNESS:  Yes, as I repeat, the

19 guarantee was an oral guarantee given by Barbi,

20 otherwise we would not have made the investment.

21          BY MR. FONTANELLA:

22     Q.   Is that also true for the next

1 letter from -- on Century Financial Brokers

2 letterhead, with a date of February 18th, 2004.

3     A.    Right.

4     Q.    That is one of the four documents that

5 you received at that meeting with Mr. Bernardi?

6     A.    Right.

7     Q.    Before you paid the additional

8 $250,000?

9     A.    Right.

10     Q.    Then why don't we just attach it as

11 part of Exhibit 8.  And so you made the next

12 investment of $250,000 the next day.  Do you

13 know the date -- the day that you made it?  You

14 can refer to Exhibit 7.

15     A.    Yes, it was 19 of February 2004.

16     Q.    So, it was the day after that letter

17 was written?

18     A.    Yes.  Because we were afraid that the

19 guarantee expire, and so Barbi mentioned again

20 the warranty we can -- if the investment was no

21 good, you receive back the money.  I guarantee

22 for you.  And at the same time, we have here

108

1 a difference.  We pay this money to the account

2 of Mr. Musan receiving vindication of Mr. Pietro

3 Barbi.

4        We got the -- we got the instructions

5 from Mr. Barbi to make the payment to the

6 personal account and not as before for the

7 certification.

8    Q.   And did Mr. Barbi say anything about

9 guaranteeing this money, the return on this

10 money, before you made the $15,000 investment?

11    A.   He constantly assured us in his

12 telephone calls that if the deal failed, he

13 would personally stand surety -- that is he

14 would guarantee our money.  So much -- so much

15 so that we -- we made additional payments, not

16 only the $15,000, but also $80,000 in September

17 and $47,500 in December.

18    Q.   Now, this is all in 2004, right?

19    A.   2004.

20    Q.   And this is before any meeting that you

21 have with Mr. Barbi and Mr. Bernardi about the

22 deal changing?

1    A.    Right, yes.

2    Q.    Okay.  In your conversation with

3 Mr. Barbi, did he again guarantee personally the

4 $30,000?

5    A.    Of course.  Not just to me, but also to

6 my father.

7    Q.    Okay.  Okay, what happens -- this is --

8 we are in -- when did you pay the $30,000?

9    A.    18 of July 2005.

10   Q.    So, you said -- the $30,000, you mean

11 the last payment?

12   A.    The last payment, yes.

13   Q.    And that was about a month after your

14 meeting in July?

15   A.    Right.

16   Q.    Or June, where you had this new

17 strategy and you pointed to Exhibit 1 and you

18 explained that to me.

19   A.    (Nodded yes.)

20   Q.    Okay, after that last payment of

21 $30,000, when is the next time that you hear

22 anything about Petros, good or bad?

148

1    Q.   And Soler.

2    A.   And Soler.

3         MR. EVANS:  No.  One Bernardi, you
4  forgot Sikka.

5         THE WITNESS:  Barbi, Soler, Bernardi,
6  Musan, and the last one, Giampiero Landoni.  Two
7  Landonis.

8         BY MR. FONTANELLA:

9    Q.   And you were all going to divide the
10 profits equally?

11   A.   Right.

12   Q.   But it was only Mr. Barbi, according to
13 you, who was going to personally guarantee your
14 investment.  Is that right?

15   A.   Yes, that was his function.  That was
16 his task.

17   Q.   His function?  In your mind was just a
18 guarantor of the investment?

19   A.   Yes, he's the surety, Musan Sikka was
20 in charge of having the bonds assessed, and
21 Soler was the person providing the bonds.

22   Q.   Now, on your behalf, your lawyer

# Exhibit 3

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3

 4 GIAMPIERO LANDONI AND          )

 5 MAURO LANDONI,                 )

 6      Plaintiffs,               )

 7      -vs-                      )  NO. 1:07-cv-462

 8 PIETRO BARBI,                  )

 9      Defendant.                )

10 ----------------------------x

11

12

13          The videotape deposition of Pietro Barbi was

14 taken on November 16, 2007 commencing at 10:25 a.m.,

15 at the office of Holland & Knight, 2099 Pennsylvania

16 Avenue, N.W., Washington, D.C., before Tammy S.

17 Newton, Notary Public.

18

19

20

21

22
```

2

```
 1              A P P E A R A N C E S

 2      ON BEHALF OF PLAINTIFFS:

 3          PHILIP J. "PETE" EVANS, ESQUIRE

 4          ELIZABETH PHELPS, ESQUIRE

 5          Holland & Knight

 6          2099 Pennsylvania Avenue, N.W.

 7          Washington, D.C. 20006

 8          (202) 457-7043

 9

10      ON BEHALF OF DEFENDANT:

11          ANDREW FONTANELLA, ESQUIRE

12          Law Offices of Andrew Fontanella

13          611 Park Avenue

14          Suite 100

15          Baltimore, Maryland 21201

16          (410) 659-7500

17

18      Also Present:

19          Carl Stoll, Interpreter

20          Mauro Landoni

21

22      (Index appears following the transcript.)
```

```
 1              P R O C E E D I N G S

 2              VIDEOTAPE OPERATOR:  Here begins Tape 1,

 3 Volume 1 in the video deposition of Pietro Barbi taken

 4 by counsel for the plaintiff, in the matter of

 5 Giampiero Landoni and Mauro Landoni versus Pietro

 6 Barbi, in the U.S. District Court for the District of

 7 Columbia, Case No. 1:07-CV-462, held here in the

 8 offices of Holland & Knight, at 2099 Pennsylvania

 9 Avenue, Northwest, Washington, D.C. 20006.

10              Today's date is November 16th, 2007.  The

11 time indicated on the video screen is 10:25:55.  My

12 name is Mia Marbury, and I am the legal video

13 specialist.  The court reporter today is Tammy Newton.

14 Also, we have the services of an interpreter, Carl

15 Stoll.  We are employed by For the Record.

16              Counsels, please introduce yourselves and

17 state whom you represent.

18              MR. EVANS:  Philip Evans, along with Libby

19 Phelps on behalf of plaintiffs, Giampiero and Mauro

20 Landoni.

21              MR. FONTANELLA:  Andrew Fontanella on

22 behalf of the defendant, Pietro Barbi.
```

4

1                VIDEOTAPE OPERATOR:  Would the court

2 reporter, please, swear in the witness and the

3 interpreter.

4      (The Interpreter was sworn by the reporter.)

5                     Pietro Barbi,

6 having been sworn by the notary, testified as follows:

7      EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8 BY MR. EVANS:

9      Q      Good morning, Mr. Barbi.

10      A      Good morning.

11      Q      My name is Pete or Phillip Evans.  I'll be

12 here asking you some questions today.  And I know you

13 were in attendance yesterday during Mr. Landoni's

14 deposition, but let me ask this:  Have you ever had

15 your deposition taken before?

16      A      Yes, I did.

17      Q      Okay.  So you -- you understand the

18 proceedings?

19      A      I think I do.

20      Q      Okay.  One thing you know is you need to

21 keep your voice up --

22      A      Right.

33

1    Q    2003?

2    A    2003, yes.

3    Q    And between you and Musan, who came up with

4 this investment opportunity?

5    A    I knew that the existence of this

6 historical bond because of the Solers (sic) family.

7 So I discuss it with -- with Musan, and then also I

8 discuss it with Mr. Bernardi, the possibility of

9 structuring a proj- -- a financial transaction using

10 those historical bonds.

11    Q    And as some of the documents we'll look at

12 later today describe an investment opportunity in

13 which these bonds would be pledged as collateral?

14    A    Correct.

15    Q    Okay.  Other than that type of investment,

16 did you contemplate or discuss anything else with

17 these bonds, as far as trying to sell them or any

18 other --

19    A    No.

20    Q    So the only opportunity that -- let me ask

21 a different question.

22         You mentioned Mr. Bernardi.  When did

1 Mr. Bernardi become involved in this?

2    A    Well, I just mentioned to him that there

3 was a possibility of using some historical bonds as

4 collateral to produce, eventually, a -- a guarantee

5 that could have been placed in the market.

6    Q    Have you ever been involved with a

7 transaction in which bonds were placed as collateral

8 in support of a guarantee similar to the one that was

9 proposed in this lawsuit?

10    A    No, personally, but I knew about it.

11    Q    How did you know about it?

12    A    I read the paper.  I was in the bank, and

13 so I -- I knew that there were transactions backed up

14 by bonds of different natures.

15    Q    Did you have any specific knowledge of --

16 by your reading or general observations, about any

17 transaction which was supported by historical bonds

18 similar to the ones the Soler family had?

19    A    The thing that I knew is that many

20 Argentine -- I shouldn't say many, but several

21 Argentineans that holds those historical bonds have

22 been trying to use them or sell them in the market.

86

```
 1    A    Yeah.

 2    Q    Yes.  Some of the young don't do faxes

 3 anymore, but you've sent --

 4    A    Right.

 5    Q    -- and received a lot of faxes.

 6         And if you look at the top of this

 7 document, you will see a fax line that reads

 8 06/11/2003 1407 --

 9    A    Right.

10    Q    -- from Excelsa Group and then to a phone

11 number, which I believe you testified is your phone

12 number?

13    A    Correct, yes.

14    Q    So looking at that, is it your testimony

15 you got this directly from Musan or --

16    A    No, I'm -- I'm sorry.  Now I've -- I've

17 noticed that I -- I got it possibly directly from

18 them, but under instructions of Musan Sikka to send it

19 to my faxes so I could forward it to the Landonis.

20    Q    Do you know why Mr. Sikka didn't have this

21 faxed directly to the Landonis?

22    A    Well, because I was the channel of
```

1 communication with the Landonis.  That's probably the

2 reason why.

3      Q      Have you ever met with or spoken with

4 Mr. or Ms. Broome?

5      A      No, never.

6      Q      Do you notice in the upper right-hand

7 corner, we have Excelsa Group with an address in

8 Gibraltar; do you see that?

9      A      Yes.

10      Q      Yet on the lower left-hand corner, we have

11 a -- what I'll call a footer for an Excelsa Group in

12 London?

13      A      Right.

14      Q      Did you ever speak with or deal with

15 anybody in Gibraltar or London concerning Excelsa

16 Group?

17      A      No.  No, I didn't.

18      Q      But the sum here, the $363,975, that was

19 wired to this account by the Landonis; is that

20 correct?

21      A      Correct.

22      Q      And the Landonis wired that money based

1 upon your instruction; is that correct?

2     A    Yes.

3     Q    What happened with that money?

4     A    As far as I know, it was sent to the bank

5 that certified the instruments, meaning the historic

6 bonds.

7     Q    And -- and which bank was it sent to?

8     A    HSBC.

9     Q    And how do you know that it was sent to

10 HSBC?

11    A    Well, that's what Musan Sikka told me.

12    Q    Did you ever see any documents or

13 correspondence involving HSBC in this transaction?

14    A    No.

15    Q    In fact, HSBC are the bankers for the

16 Landoni family; is that correct?

17    A    Yes.

18    Q    Okay.  So putting aside the documents that

19 might reflect the monies that the Landonis advanced --

20    A    Yes.

21    Q    -- you never saw any documents from HSBC?

22    A    No.

1    Q    Did you ever ask Mr. Sikka for any of the

2 documents?

3    A    I -- I -- I did, but he said that he was

4 keeping all the records himself.

5    Q    Did you ever ask him why he was keeping all

6 the records himself?

7    A    He said that it was not necessary to -- to

8 send a document around.

9    Q    And why was that?

10    A    I don't know.

11    Q    Did that ever concern you?

12    A    Not really.

13    Q    Did you ever speak to anybody at HSBC about

14 this investment?

15    A    No.

16    Q    Do you know if Mr. Bernardi ever spoke to

17 anybody at HSBC about this investment?

18    A    Not that I know.

19    Q    Did you ever invest any money in this

20 transaction personally?

21    A    Yes, I did.

22    Q    How much did you invest?

1 compared to the Landonis?

2    A    Because we couldn't reach the amount

3 necessary to -- requested by the bank to extend the --

4 the guarantee.

5    Q    Well, did you ever ask the Landonis for

6 additional money, and they said no?

7    A    Right.

8    Q    That happened?

9    A    I think it happened on one -- one occasion.

10    Q    And who had that communication with the

11 Landonis?

12    A    I --

13    Q    Did you have that communication with the

14 Landonis should be a better question.

15    A    I probably did, yes.  Either myself or

16 Bernardi, one or the two.

17    Q    Okay.  But do you recall -- do you ever

18 specifically recall -- you will agree with me that in

19 the course of this investment, you initiated at least

20 five communications --

21    A    Yes.

22    Q    -- that resulted in the Landonis making

94

 1 payments?

 2    A    Yes.

 3    Q    Because I think the sixth payment was

 4 actually in response to a request by Mr. Sikka

 5 directly?

 6    A    Yes.

 7    Q    Okay.  Do you recall how many times you

 8 asked the Landonis for money and they said no, we

 9 don't have any -- we can't provide anymore monies, or

10 we won't do it?

11    A    I don't recall.  Probably one time.

12    Q    Do you recall who you spoke with: Mauro,

13 Giampiero, both?

14    A    I think Mr. Giampiero.

15    Q    Giampiero.

16    A    Yeah.

17    Q    And -- and am I -- am I correct, my

18 understanding is that your telephone conversations

19 were more with Giampiero than with Mauro?

20    A    Yes.

21    Q    The money was wired to Excelsa Group in

22 November 2003?

1    A    That they're in the possession of several

2 families; that, you know, they got them as a -- as

3 a -- how do you say? -- (in Italian).

4            THE INTERPRETER:  Indemnity.

5            THE WITNESS:  Indemnity.

6 BY MR. EVANS:

7    Q    Mr. Barbi, are you aware that the

8 government of Argentina passed a law in 1942 that

9 extinguished -- extinguished these obligations and

10 forgave the debt?

11    A    No.

12    Q    When HSBC returned these bonds to you, did

13 anybody tell you why HSBC wouldn't issue the

14 guarantee?  Or what was their role, if I misspoke?

15    A    Their role was to certify and validate the

16 bonds.

17    Q    Did they ever do that?

18    A    They did, because the Deutsche Bank

19 eventually made a commitment letter to issue the

20 guarantee.

21    Q    Did you ever see or hear from any official

22 HSBC that they had certificated and validated these

102

1 bonds?

2    A    No, I didn't.

3    Q    How did you hear that information?

4    A    From Musan Sikka.

5    Q    Did you ever ask Mr. Sikka for written

6 confirmation about HSBC's role?

7    A    No.  He said that everything was fine; that

8 the Deutsche Bank had accepted the -- the

9 certification evaluation of -- of HSBC and that they

10 were going to issue the -- the commitment letter.

11        MR. EVANS:  We just did 6 and 7, right?

12        THE COURT REPORTER:  Uh-huh.

13        MR. EVANS:  So let's do 7, 8, and 9 -- no;

14 8, 9, and 10.

15        THE WITNESS:  This is 6.

16        MR. EVANS:  So that was 5 and 6?

17        MR. FONTANELLA:  Six and 7.

18        MR. EVANS:  Six and 7.

19        MR. FONTANELLA:  So we're at 8, 9, and 10.

20        (Deposition Exhibit No. 8 was marked for

21 identification and attached to the transcript.)

22        (Deposition Exhibit No. 9 was marked for

105

1    A    And the Landonis, yes.

2    Q    Did you send these documents to Mister --

3 Mr. Solers?

4    A    Yes, I did.

5    Q    Okay.  Did you receive any other documents

6 from Mr. Sikka at this time?

7    A    No.

8    Q    Did you send Mr. Solers any documents other

9 than these three at that time?

10    A    No.

11    Q    Let's look at the first one, Exhibit 8, the

12 two-page document.  And it's titled a "Facility Offer

13 Letter"?

14    A    Yes.

15    Q    Do you see that?

16    A    Yes.

17    Q    And it's issued from Deutsche Bank in

18 Singapore, correct?

19    A    Yes.

20    Q    Do you know why Deutsche Bank from

21 Singapore was involved in this transaction?

22    A    Because Sikka had made the contact with

106

1 them and with HSBC in Singapore.

2    Q    Now, you keep referring to HSBC.  Have you

3 ever seen HSBC referred to in any of these documents?

4    A    No.

5    Q    Did Mr. Sikka tell you who at Deutsche Bank

6 he had identified, the name of any individual?

7    A    He said that he was talking to a vice

8 president, the director of the office in -- in -- in

9 Deutsche Bank.

10    Q    Now, if you look at Exhibit No. 9, we see

11 reference to an S.W. Goldberg?

12    A    Correct.

13    Q    Is that the person Mr. Sikka identified?

14    A    Yes.

15    Q    Did you ever speak with Mr. Goldberg?

16    A    No.

17    Q    Do you know -- you may know a Mr. Goldberg,

18 but do you know a Mr. Goldberg who's a banker in

19 Singapore?

20    A    I assume that he was, because --

21    Q    But you've never met or spoken to him?

22    A    No, I never met him and never spoke to him.

1    Q    You have no independent knowledge of this

2 gentleman?

3    A    No.

4    Q    You'd heard of Deutsche Bank?

5    A    Yes.

6    Q    Did you -- have you -- in your banking or

7 investment businesses, have you ever done any

8 transactions with Deutsche Bank?

9    A    No.

10    Q    Do you know anybody who works for Deutsche

11 Bank?

12    A    Well, I think I dealt with Deutsche Bank

13 for a letter -- commercial letters of credit.

14    Q    Okay.

15    A    But I never had a -- a personal -- I mean,

16 never dealt besides, you know, the letter --

17 commercial letter of credit.

18    Q    You had seen documents that were issued by

19 Deutsche Bank?

20    A    Right.

21    Q    But, for example, in your role --

22    A    Not from Sing- -- from Singapore.  From

125

1 the guarantee in place, you expected the positive

2 returns of the investment money to start flowing very

3 shortly, did you not?

4      A     That's right.

5      Q     What was the basis of your understanding to

6 support that payment?

7      A     That if I recall, it was -- did you mean

8 the 250?

9      Q     No.  The 250 had gone.

10     A     Had gone, yes.

11     Q     And you now met with the -- the

12 Landonis --

13     A     Right.

14     Q     -- in March of 2004?

15     A     Correct.

16     Q     At that meeting, you told them that

17 everything was in place?

18     A     Yes.

19     Q     And you expected the investment's returns

20 to start coming through soon; is that correct?

21     A     Yes, correct.

22     Q     And what was the basis for your statement,

126

1 then, that you thought everything was in place and the

2 money should start flowing?

3    A    Because Musan Sikka instructed me that

4 everything was in place, at least until that

5 particular moment and that shortly the investment

6 would have initiated.

7    Q    But, in fact, the money did not flow?

8    A    No.

9    Q    Now, when you met with the Landonis in

10 March of 2004, did you make any promises or guaranties

11 to them about the investment?

12    A    No, I didn't.

13    Q    What did you say to them about the

14 investment, other than you expected the monies to be

15 coming shortly, at that meeting?

16    A    Anything they -- they already knew about

17 it.  I don't recall now the conversation, the complete

18 conversation.  But basically we discussed that, you

19 know, what the steps were done and -- and what we --

20 what has been achieved so far.

21    Q    Now, over the next few months after -- tell

22 me what -- you had a meeting at the Landoni residence?

151

1    Q    And do you recall if any commitment was
2 made to them at that meeting as to when Mister -- and
3 I assume Mr. Sikka was going to put together this new
4 alternative?

5    A    Correct.

6    Q    When did Mr. Sikka say he expected to be
7 able to get this done?

8    A    The next month or so.

9    Q    In fact, did he get it done in the next
10 month or so?

11    A    No, he didn't.

12    Q    Now, are you aware that shortly after this
13 meeting, about a month after this meeting, Mr. Sikka
14 contacted the Landonis directly and asked them to
15 contribute another $30,000?

16    A    They told me that he contacted them, yes.

17    Q    Mr. Sikka told you that?

18    A    Yes.

19    Q    Okay.  Why -- do you know, why did
20 Mr. Sikka go directly to the Landonis this time?

21    A    Well, I guess because, after the meeting,
22 he met them, and so he felt more comfortable to talk

152

1 directly to them.  And I think that's been an exchange

2 of telephone and business cards at that point.

3       Q      Did you ever get a business card from

4 Mr. Sikka?

5       A      Yes, I did.

6       Q      Do you have it now at your house?

7       A      No.  I don't have --

8       Q      Not here?

9       A      Not here.

10      Q      Do you think you have it at your home?

11      A      I believe so, yeah.

12      Q      Do you recall at this June 2005 meeting if

13 you ever advised the Landonis that you had made your

14 own $100,000 contribution?

15      A      I never told them.

16      Q      Why not?

17      A      Well, I don't remember.  Honestly, I don't

18 remember if I told them.  But I don't -- I don't think

19 I told them right away, but eventually I told them in

20 another meetings that we had later on, I guess or --

21 or over the phone.

22      Q      By June of 2005, what representations or

```
 1    Q      Did you ever mention it to your wife?

 2    A      Vaguely, yes.

 3    Q      How about your in-laws?

 4    A      No.

 5    Q      Whose idea was it to -- what do -- what do

 6 you think -- what's Exhibit 11 do?  What are you --

 7 what are you promising to do?

 8    A      Well, to -- to reimburse the money that

 9 they have invested in the transaction, if I -- if it

10 didn't go through.

11    Q      Did you ever provide this letter to -- to

12 Mr. Sikka?

13    A      No.

14    Q      Did you provide this letter to

15 Mr. Bernardi?

16    A      No, I didn't.  Well, actually, yes.  He

17 has -- because I -- he has a copy of this letter.

18    Q      Did you ever talk to Giampiero Landoni

19 about the threats that you say Mauro made against you?

20    A      Yes, I did.

21    Q      And what were the nature of those

22 conversations?
```

158

1    A    Nature was that Mauro was very impulsive.

2 He was a -- you know, a younger guy.  He was impulsive

3 and not to take it too seriously.

4    Q    Did you have this discussion with Giampiero

5 before or after you sent this letter?

6    A    No.  I -- I -- I did it after -- after the

7 conversation.

8    Q    After Mauro threatened you?

9    A    After -- after the threats, yes.

10    Q    And his threat was over the phone?

11    A    Yes.

12    Q    Mauro Landoni -- you met Mauro Landoni

13 face-to-face before these proceedings how many times?

14    A    I believe two times.

15    Q    Two times?

16    A    Yes.

17    Q    Did he ever threaten you at either of those

18 meetings?

19    A    No.

20    Q    Do you think you're personally responsible

21 for the monies the Landonis have lost in this

22 transaction?

159

```
 1      A      No, I'm not.
 2             MR. FONTANELLA:  Objection.
 3 BY MR. EVANS:
 4      Q      You may still answer.
 5      A      Pardon me?
 6      Q      You may still answer.
 7      A      Oh, okay.  No.
 8      Q      Who is responsible?
 9      A      Musan Sikka.
10      Q      Have you received any money from Musan
11 Sikka or payment or gift in the past five years?
12      A      No.
13      Q      Have you asked Mr. Sikka for any money?
14      A      No, I didn't.
15      Q      Have you asked Mr. Sikka to help resolve
16 the claim of the Landonis?
17      A      Yes, I did.
18      Q      And what did he say to that?
19      A      He said that he doesn't have the money
20 right now to solve this case.
21      Q      Did you ever ask him what happened to the
22 money?
```

163

1    Q    -- this fax?

2         You do?

3    A    Yes.

4    Q    Okay.  On the -- the first page of

5 Exhibit 12, I can tell that there's a short note from

6 Giampiero to Pietro?

7    A    Yes.

8    Q    But I can't tell what nota nell'allegato

9 means.

10   A    See attached.

11   Q    See the attached?

12   A    See the attached.

13   Q    Okay.  And -- and what is the subject line?

14   A    Subject line is the -- is my --

15   Q    Not on the letter.  On the -- on the fax.

16 On the front of the fax.

17   A    On the fax?  The subject is "Your

18 commitment letter, 28 September 2005."

19   Q    Okay.  Do you recall if there were any

20 phone conversations between you and Giampiero around

21 this time about this -- about why he chose to send

22 this fax or why he was sending this fax?

164

```
 1     A      Just to remind me that I -- I made a

 2 commitment in repaying it.

 3            MR. EVANS:  Okay.  And let's mark this as

 4 lucky 13.

 5            (Deposition Exhibit No. 13 was marked for

 6 identification and attached to the transcript.)

 7 BY MR. EVANS:

 8     Q      Now, the reporter has placed in front of

 9 you what we've marked as Exhibit 13, which is a letter

10 from Pietro Barbi --

11     A      Yeah.

12     Q      -- to Giampiero Landoni, 11 May 2006.

13     A      Yes.

14     Q      Correct?

15            Do you recall seeing the first page of

16 Exhibit 13 before?

17     A      Yes.

18     Q      In fact, did you draft this letter --

19     A      Yes.

20     Q      -- and send it to Mister --

21     A      Landoni.

22     Q      -- Landoni?
```

# Exhibit 4

TO                  :          **Mr Pietro Barbi**
                                   **P/C Andrea Bernardi**
COMPANY    :
TEL.              :
FAX              :          001 202 3623114


FROM           :          Giampiero Landoni
COMPANY    :
TEL.              :
FAX              :          39 02-93507815

Date    :      29th March,2006
*Number of page including this one : 1+1*

## Subject :    "Vostra impegno lettera del 28 Settembre 2005"


Gentile *Pietro,*


Nota nell'allegato


Saluti.

**Giampiero Landoni**

**EXHIBIT**
Barbi #12
11/16/07

Egr. Sig.ri
Giampiero Landoni
Mauro Landoni
Corso Europa 197
Rho(Milano)
Italia

Stimatissimi Sig.ri Landoni,

Prima di ogni altra cosa voglio esprimervi la mia più profonda gratitudine per la fiducia e stima che mi avete concesso dal primo momento che ci siamo conosciuti, questo grazie al nostro comune amico Andrea Bernardi di cui ho immenso rispetto come lo ho di voi.

Come espresso nella nostra conversazione telefonica del 14 settembre 2005 insisto nel avere sempre piena fiducia nella nostra operazione e la capacità di Musan di portarla a termine.

Premesso questo, per mezzo di questa lettera voglio confermarvi che nel caso che la operazione non dovesse andare a buon fine per qualsiasi ragione, io mi assumo personalmente la responsabilità della restituzione del capitale apportato da voi in detta operazione, non più tardi del 30 novembre 2005, esautorando da ogni responsabilità ogni altra persona. Sono arrivato a questa decisione per rincuorarvi e affinchè non pensiate che la operazione sia stata intentata come un mezzo subdolo per appropriarsi di fondi altrui.

Vi ringrazio per la continua fiducia e pazienza.

In fede,

Pietro Barbi

Washington 28 Settembre 2005

```
                      ***********************
                      ***   RAPPORTO TX   ***
                      ***********************


     TRASMISSIONE OK

     NR.TX/RX              1179
     #TEL.CORRISPOND.              0012023623114
     SUBINDIRIZZO
     NOME CORRISPOND.
     ORA INIZ              29/03 16:22
     T. USATO             00'40
     PAGG. INVIATE           2
     RISULTATO            OK
```

| | | |
|---|---|---|
| TO | : | **Mr Pietro Barbi**<br>**P/C Andrea Bernardi** |
| COMPANY | : | |
| TEL. | : | |
| FAX | : | 001 202 3623114 |
| | | |
| FROM | : | Giampiero Landoni |
| COMPANY | : | |
| TEL. | : | |
| FAX | : | 39 02-93507815 |

Date  :     29th March,2006
*Number of page including this one : 1+1*

## Subject :   "Vostro impegno lettera del 28 Settembre 2005"

Gentile *Pietro,*

Nota nell'allegato

Saluti